IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Diebold Holding Company, LLC, *et al.*,[1] | : | Case No. 23-90602 (DRJ) |
| | : | |
| Debtors. | : | (Joint Administration Requested) |
| | : | |

**DECLARATION OF CARLIN ADRIANOPOLI
IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION
FINANCING SECURED BY SENIOR LIENS, (II) AUTHORIZING THE DEBTORS TO
USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION, (IV)
SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF**

I, Carlin Adrianopoli, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I submit this declaration (the "Declaration") in support of the relief that the Debtors' have requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Post-Petition Financing Secured by Senior Liens, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling Final Hearing and (IV) Granting Related Relief* (including all exhibits thereto, the "DIP Motion").[2]

2. Further information about FTI Consulting, Inc.'s ("FTI") prepetition retention by Diebold Nixdorf, Incorporated ("Diebold") and proposed retention by the Debtors in

---

[1] The Debtors are the following ten entities (the last four digits of their respective federal taxpayer identification numbers, if any, follow in parentheses): Diebold Nixdorf, Incorporated (3970); Diebold Nixdorf Technology Finance, LLC (9709); Diebold Global Finance Corporation (2596); Diebold SST Holding Company, LLC (3595); Diebold Holding Company, LLC (3478); Diebold Self-Service Systems (8298); Griffin Technology Incorporated (4416); Impexa, LLC (1963); Diebold Nixdorf Canada, Limited (N/A); and Diebold Canada Holding Company Inc. (N/A). The Debtors' noticing address in these Chapter 11 Cases is 50 Executive Parkway, Hudson, OH 44236.

[2] Capitalized but undefined terms herein shall be given the meaning provided in the DIP Motion.

these Chapter 11 Cases, and my professional experience can be found in the *Declaration of Carlin Adrianopoli, Financial Advisor for the Debtor Diebold Nixdorf, Incorporated, in Support of First Day Motions of Debtors and Debtors in Possession* [Docket No. __] (my "First Day Declaration") filed contemporaneously herewith.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) information provided to me by the Company's management team, other members of the FTI team and the Company's other advisors; (c) my review of relevant documents; and/or (d) my opinion based upon my experience. I am not being compensated specifically for this testimony other than through payments that FTI has received in accordance with the terms of Diebold's prepetition engagement of FTI for work performed prepetition and in accordance with the terms of any postpetition engagement of FTI approved by the Court. If called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

4. Since May 2022 FTI has served as a consulting advisor to the Company. In August 2022, the Company engaged FTI with respect to the Company's cash management efforts. During the course of its engagement, FTI has worked closely with the Company's management and other professionals retained by the Company with respect to these Chapter 11 Cases and has become well-acquainted with the Company's capital structure, liquidity needs and business operations.

5. In March 2023, the Debtors authorized FTI, in coordination with its other professionals, to initiate the process of evaluating the Company's financing needs and financing alternatives to fund a potential restructuring. FTI worked closely with the Company and its other advisors to determine the Company's cash needs for their businesses and potential insolvency proceedings for certain Company affiliates. The options with respect to postpetition financing

were limited by the Company's near- and long-term liquidity needs, the projected cash losses, and its prepetition capital structure.

6. The Debtors and FTI prepared a DIP Budget, which forecasts the Debtors' cash needs in the initial 13 weeks of these Chapter 11 Cases, and a process for updating the initial DIP Budget on a rolling basis thereafter. FTI assistance to the Debtors' developing the DIP Budget, includes, but is not limited to: (a) evaluating assumptions used to forecast cash receipts and disbursements; (b) developing a process to (i) maintain and update the forecast on a rolling basis during the course of these Chapter 11 Cases and (ii) compare the DIP Budget and subsequent iterations to actual results to allow for variance analysis; and (c) assisting the Debtors with developing and implementing a process for variance reporting. Through these efforts, the Debtors will be able to more accurately project anticipated cash inflows and outflows during these Chapter 11 Cases and more quickly respond to appropriate inquiries from various parties in interest.

7. FTI was also involved, along with the Company's other advisors, in the Debtors' efforts to obtain financing for Company's comprehensive balance sheet restructuring. As detailed below, FTI, in coordination with the Company's other professionals, evaluated the Company's financing needs for a comprehensive balance sheet restructuring and advised the Company regarding those needs. FTI, along with the Company's other advisors, was involved in discussions and negotiations regarding such potential financing. After the DIP Lenders told the Company that they would provide financing only through debtor-in-possession financing approved by a bankruptcy court, the Debtors began negotiating financing for these Chapter 11 Cases. I was involved in those negotiations, including with respect to the DIP Financing that the Debtors ultimately obtained. During the course of those discussions and negotiations, FTI advised the

Debtors regarding, among other things, the impact of various proposed financial covenants and financing structures.

8. The DIP Financing is critical in that it provides the Debtors with the necessary liquidity to fund their operations, capital expenditures and corporate costs over the duration of these Chapter 11 Cases. The DIP Facilities will substantially enhance the Debtors' ability to minimize disruption to their business and instill confidence in their various creditor constituencies, including customers, employees and vendors, allowing the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all stakeholders.

9. Prior to the Petition Date, the Company exhausted most of its available cash to fund the Company's (including the Debtors') businesses. The Company urgently requires access to additional cash during these Chapter 11 Cases, not only to fund ongoing operations and pay for restructuring costs, but also to, among other things, pay substantial outstanding trade debt obligations of Debtors and non-debtor foreign affiliates to avoid the risk of piecemeal insolvency filings around the world.

10. The Company is a dispersed, global enterprise with many non-debtor foreign affiliates that will not be parties to these Chapter 11 Cases or subject to the Dutch Scheme Proceeding. Moreover, I understand that a Dutch moratorium, if granted, will only stay creditors subject to the scheme (i.e., funded debt creditors) from taking actions against the Dutch Scheme Parties. Due to the Company's constrained liquidity leading up to the filing of these cases, many of the non-debtor foreign affiliates have significant outstanding trade debt. I have been informed that these foreign trade creditors will arguably not be stayed from taking actions against those non-debtor foreign affiliates, such as taking collection actions or withholding delivery of critical goods

and services. These actions could disrupt the Company's businesses and interfere with its restructuring efforts in these Chapter 11 Cases and the Dutch Scheme Proceeding. Critically, foreign creditors could seek involuntary insolvency proceedings in their jurisdictions or directors of certain of the foreign entities may conclude that they must take such actions to avoid liability (including filing voluntary insolvency proceedings). Accordingly, the Company has determined that it is important to bring these foreign trade creditors current to stave off any actions that could interfere with the Company's restructuring efforts, and the Company's lenders have agreed through their entry into the Restructuring Support Agreement.

11. In the lead up to the filing of these cases, the Company determined that it would require financing that would provide sufficient cash to (a) fund their business operations during these cases, (b) bring foreign trade creditors current, (c) reduce the delinquencies of domestic trade creditors and (d) fund the costs of its balance sheet restructuring. The Company also determined any such financing would likely have to come from certain of its existing lenders. The Company further determined that it would require the use of the lenders' cash collateral (the "Cash Collateral"). As described in my First Day Declaration, the Company has over $2.6 billion of secured debt. Without certain existing lenders' consent, the Company determined it likely would not be able to obtain sufficient financing to achieve its objectives.

12. Therefore, the Company approached certain existing lenders about providing financing that would satisfy the Company's four principal objectives. After hard-fought, arm's-length negotiations, certain existing lenders agreed to provide the Debtors with financing that, if approved by the Court, would satisfy these objectives. To accomplish the Debtors' goal of ensuring the stability of their foreign affiliates, the DIP Lenders agreed to refinance and pay off the senior-most secured prepetition financing – the 2025 Superpriority Term Loan Facility and the

2026 ABL Facility – under which several foreign entities are either borrowers and/or guarantors. The Debtors therefore are seeking authority to enter into a debtor-in-possession credit facility, as described in the DIP Motion, that will provide $1.25 billion in postpetition financing (the "DIP Financing") in the form of a $1.25 billion DIP-to-exit term loan, consisting of approximately $517 million in new money and an approximate $733 million refinancing of existing secured indebtedness.  Through the DIP Financing and the use of Cash Collateral, the Company will have access to the necessary funding to, among other things, (a) continue the day-to-day operations of the Company's and the Debtors' businesses, (b) provide liquidity required to immediately reduce the substantial backlog of past-due foreign and domestic trade debt, (c) fund these Chapter 11 Cases and the Dutch Scheme Proceeding and (d) refinance and pay off the 2026 ABL Facility and 2025 Superpriority Term Loan Facility (including the Make-Whole Amount of $91 million). Securing the DIP Financing with the support of the Consenting Creditors, who are DIP Lenders, sends a strong and positive message to the Company's foreign and domestic directors, employees, regulators, business partners and trade vendors.

13. Without DIP Financing being in place at the outset of these Chapter 11 Cases, the Debtors' customers, suppliers, employees, regulators and others may lose confidence in the Debtors' ability to operate their businesses postpetition and successfully reorganize.  Reduced confidence may result in additional unforecasted cash drains on the Debtors' operations if, for example, (a) the Debtors delivered fewer products due to the loss of customers or delays in customer orders, (b) the Debtors' costs of production were to increase due to lower productivity as a result of employee attrition and other unforeseen operational disruptions, or (c) suppliers demand collateral or shortened trade terms or disrupt supply.  Each of these scenarios would negatively impact the Debtors' cash flow and potentially harm the Debtors' ability to successfully reorganize

and maximize value for their stakeholders.  Incurring short-term cash losses without the assurance of adequate financing immediately to finance and complete a restructuring could irreparably harm the Debtors.

14. The DIP Financing, including the consensual use of Cash Collateral, provides the Company and the Debtors with their best opportunity to maintain their current operations and implement a successful restructuring for the benefit of their creditors.  In light of the Debtors' overall circumstances, the Debtors believe that they could not obtain postpetition financing from another lending source on terms equal or superior to the DIP Financing.

15. The Debtors' businesses are cash intensive, with significant daily costs to install and maintain self-service transaction systems and physical security products, satisfy obligations to employees and vendors.  As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value and pursue their restructuring goals.  As noted above, the Debtors, in consultation with FTI, have performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and FTI prepared the DIP Budget outlining the Debtors' postpetition cash needs in the initial 13 weeks of these Chapter 11 Cases.  A copy of the DIP Budget (which will be updated from time to time in accordance with the DIP Credit Agreement) is attached as Exhibit B to the DIP Motion.  The DIP Budget reflects the Debtors' funding requirements over the identified period and will allow them to meet their obligations – including the administrative expenses in these Chapter 11 Cases – and is reasonable and appropriate under the circumstances.  Further, the DIP Budget also contemplates this Court granting certain of the first day relief sought by the Debtors, including the authority to pay prepetition Ordinary Course Claims (as defined in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay All*

*Prepetition Trade and Other Unimpaired Claims, Including Taxes and Fees and Customer Program Amounts, in the Ordinary Course of Business on a Postpetition Basis, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, (III) Authorizing the Debtors to Maintain Certain Customer Programs and (IV) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* in the ordinary course of business.

16. As reflected in the DIP Budget, the Company will start these Chapter 11 Cases with approximately $140 million in cash and are forecasted to disburse over $668 million in the next six weeks. Interim approval of the DIP Financing is critical for the Company to continue operation of their businesses as absent such relief, the Company would have insufficient liquidity to operate their business.

17. Based on the information available to me, and my observations during the course of the negotiations over the DIP Facility, it is my opinion that (a) the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's-length, (b) the DIP Facility, along with consensual use of Cash Collateral, provides the Debtors with necessary and sufficient liquidity for these Chapter 11 Cases based on current projections and (c) entering into the DIP Facility is in the best interests of the Debtors' estates.

18. For all of these reasons, I believe that the Debtors' decision to enter into the DIP Credit Agreement, borrow the funds available under the DIP Facility and seek consensual use of Cash Collateral is a sound exercise of their business judgment.

Dated:  June 1, 2023  
   Cleveland, Ohio

/s/ *Carlin Adrianopoli*  
Carlin Adrianopoli  
Senior Managing Director FTI Consulting